EMERY V. MAZANEC ET AL., APPELLEES, V. LINCOLN BONDING AND INSURANCE COMPANY, A CORPORATION, APPELLANT.

100 N. W. 2d 881

Filed January 15, 1960. No. 34640.

*Chambers, Holland, Dudgeon & Hastings,* for appellant.

*W. E. Mumby* and *Perry, Perry & Nuernberger,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

On March 14, 1957, plaintiffs, Emery V. Mazanec and Ardeyne D. Mazanec, as husband and wife, brought this action against defendant, Lincoln Bonding and Insurance Company, seeking cancellation of a note and an alleged void real estate mortgage securing payment thereof, which defendant allegedly procured on March 15, 1951, by various false representations made by defendant's then president, Edward A. Dosek, upon which plaintiffs relied and were injured thereby in making the transaction. A purported copy of the note and a copy of the mortgage were attached to and by reference made a part of plaintiffs' petition.

The note, dated January 2, 1951, and payable to defendant in 10 years, was for $30,000, with interest at 2 percent payable annually, which was secured by a mortgage of even date and amount on about 2,560 acres of described land belonging to plaintiff, Emery V. Mazanec, in Sioux County, where the mortgage was recorded March 21, 1951. Such instruments were allegedly given in exchange for a $30,000 surplus note of defendant dated April 18, 1951, with interest at 6 percent payable to plaintiffs annually. A copy of such surplus note, which recited the statutory provisions authorizing its execution and conditions under which it was payable, was attached to and by reference made a part of plaintiffs' petition.

The alleged false representations upon which plaintiffs relied were in substance: That defendant was the oldest and biggest bonding company in Nebraska, and as strong as any company in the state; that its business was good and successfully expanding; that it was skillfully and successfully operated by its officers; that its operations, assets, and assured solvency were supervised and approved by the state Department of Insurance,

which made defendant maintain $2 for every $1 of surplus notes; that defendant seldom suffered any losses and was making great profits; that the purpose of seeking plaintiffs' investment was for expansion of the company and to help common people; that the transaction was simply a paper trade or exchange costing plaintiffs nothing, but giving them $1,200 a year profit from defendant's surplus note approved by the Department of Insurance, without possible loss to plaintiffs; that defendant would never foreclose plaintiffs' mortgage; and that plaintiffs would never be required to pay the $600 interest on their note and mortgage until after they received the $1,800 interest on defendant's surplus note, which defendant was in a financial position to pay.

In that connection, plaintiffs alleged that such representations continued "until on or about the first day of June, 1955, when the defendant first learned that the Director of the State Department of Insurance contended that the company was approaching insolvency, that it had been dishonestly managed, that it did not have sufficient funds to pay its expenses and losses and that said Department of Insurance refused to issue a new license to the defendant or to permit it to operate as a bonding and insurance company." Further, plaintiffs' petition alleged: "Plaintiffs never learned of any fact which would put them on inquiry as to representations on which they relied being false until on or about June 2, 1955," and that "As soon as plaintiffs learned that their note and mortgage had been obtained by such fraudulent representations as to the contents and operations of said company and learned that the company had refused to keep and perform * * * by the payment of the amount due on the said 'Surplus Note,'" that plaintiffs tendered to defendant its surplus note on March 1, 1957, together with $3,839, the amount plaintiffs had received on the surplus note over and above the amount paid on plaintiffs' note and mortgage, but defendant refused the tender, which was renewed and

refused at the trial. Plaintiffs' prayer was for cancellation of the note; that the mortgage be held for naught and stricken from the records of Sioux County; that title be quieted in plaintiffs against purported lien of the mortgage; and for equitable relief.

Defendant's answer admitted that on or about January 2, 1951, plaintiffs made, executed, and delivered to defendant the note and mortgage aforesaid; and that on March 1, 1957, plaintiffs made the tender which defendant refused as alleged. Defendant then, as far as important here, denied generally and alleged in substance that on or about June 1, 1955, defendant informed plaintiffs that the Department of Insurance had examined defendant company and would not permit it to operate because of its "impaired financial structure and perilous underwriting practices" unless new officers were elected, and that such steps had been taken; and that on September 12, 1955, defendant informed plaintiffs of severe losses suffered by defendant, and that because thereof, it would be required to discontinue further operations at an early date. Defendant then alleged that after June 1, 1955, and prior to May 8, 1956, plaintiffs personally and through representatives made investigations of the operations and conditions of defendant company; that thereafter, on May 8, 1956, plaintiffs paid defendant the interest due on plaintiffs' note and mortgage; that plaintiffs, by their conduct, confirmed and ratified the transaction between the parties from June 1, 1955, until about March 1, 1957, and induced defendant and its officers to continue to furnish free rent and services without compensation to defendant, in reliance upon validity of plaintiffs' note and mortgage; that plaintiffs, after notice and knowledge concerning the affairs and condition of the company on or about June 1, 1955, retained defendant's surplus note and the income therefrom, without offering to rescind the transaction, until March 1, 1957; and that under the circumstances plaintiffs delayed their attempted re-

scission too long to entitle them to the relief sought by them. Defendant's cross-petition alleged that plaintiffs had failed, neglected, and refused to pay the interest due January 2, 1957, on the note to defendant, who prayed for an accounting of the amount due and foreclosure of plaintiffs' mortgage as provided in the acceleration clause therein.

Plaintiffs' reply to defendant's answer denied generally, then alleged in substance that the purported mortgage was never acknowledged or otherwise binding on plaintiffs, but was a nullity, and the recording thereof was a fraud upon plaintiffs; and that plaintiffs relied upon advice of defendant's officers who lulled them into a sense of security up to and including May 8, 1956, when for the first time plaintiffs learned that they were defrauded, and they realized that it was necessary for them to employ counsel and assert their rights, but defendant and its officers succeeded in concealing the extent and nature of the fraud until early in December 1956, whereupon they elected to rescind on March 1, 1957. Plaintiffs' answer to defendant's cross-petition denied generally, then renewed the allegations of their petition and reply, and renewed the prayer of their petition. Defendant's reply to that answer admitted plaintiffs' tender on March 1, 1957, and denied generally.

The cause was tried on the merits May 15 and 16, 1958, and the parties were directed to submit the matter on written briefs. Thereafter, on February 2, 1959, a judgment was rendered which found generally in favor of plaintiffs and against defendant, and decreed that plaintiffs' note and mortgage should be held for naught and stricken from the record, and that title to the land described in said mortgage should be quieted and confirmed in plaintiff, Emery V. Mazanec, against any and all claims of defendant, with costs taxed to defendant. Thereafter, on March 16, 1959, motions for new trial respectively filed by defendant on February

10, 1959, and February 25, 1959, were overruled, and defendant appealed, assigning in substance and effect that the judgment of the trial court was contrary to the evidence and law, and that the trial court erred in denying defendant's cross-petition. We sustain defendant's assignments in the manner and to the extent hereinafter set forth.

Hereinafter, Emery V. Mazanec will be called plaintiff. When referring to Ardeyne D. Mazanec, she will be called plaintiff's wife, and when speaking of both, they will be called plaintiffs. Defendant, Lincoln Bonding and Insurance Company, will be called defendant or the company, and Carroll R. Pauley will be called Pauley.

The cause will be tried de novo here in conformity with the rule reaffirmed in Town of Everett v. Teigeler, 162 Neb. 769, 77 N. W. 2d 467. However, we point out that there is little dispute with relation to the relevant and material evidence, and that in such respect plaintiffs' brief makes several statements and their pleadings make several allegations which are not supported by any competent evidence.

As summarized, the record discloses the following: On March 15, 1951, Edward A. Dosek, hereinafter called Dosek, was president of defendant company, and a majority of the board of directors were members of Dosek's family. Plaintiff, who had an eighth-grade education, was engaged in the cattle business on about 2,560 acres of described clear land owned by him near Hemingford in Sioux County. Plaintiffs' homestead, a part thereof, was alleged to be the "NE¼ of Section 26, Township 27N, Range, 53" and there is no dispute about that. Plaintiffs first met Dosek at their home the evening of March 15, 1951. One Joe Bayer, who had known plaintiff since about 1941 and had known plaintiff's wife since about 1946, went there with Dosek. Bayer, a general insurance agent, who wrote insurance as agent for defendant and other companies, had theretofore sold various kinds of insurance to plaintiffs. He was friend-

ly with plaintiffs and they had confidence in him. Plaintiff, Dosek, and Bayer were all Bohemians who could speak and understand that language, but plaintiff's wife was not Bohemian and could not speak nor understand that language. In such respect, however, and contrary to plaintiffs' contention, the conversation that evening at plaintiffs' home was in the English language except for possibly some Bohemian slang words.

Sometime before March 15, 1951, Dosek had asked Bayer if he had some friends who might be interested in making an investment in defendant company. Bayer had responded by suggesting the names of two persons, one of whom was plaintiff. Dosek then said that he was going up that way soon and would like to meet plaintiff. Before March 15, 1951, Bayer saw plaintiff and asked him whether he would care to make an investment in an insurance company, and plaintiff replied that he might. Thereafter, Dosek and Bayer left Lincoln in Dosek's car, and after stopping at other places on business, they arrived at plaintiffs' home on March 15, 1951, in the evening, where Bayer introduced Dosek to them as the man who had defendant company. There they all had supper together, visited during the evening, and Dosek made the representations heretofore summarized, upon which plaintiffs allegedly relied as they had a right to do, and were thereby injured in completing the transaction hereinafter set forth. In that connection, on the evening of March 15, 1951, plaintiffs each admittedly signed the note and mortgage heretofore described, which were blank except for such signatures. Bayer signed as a witness to the mortgage. The consideration for such transaction was to be defendant's surplus note heretofore described, which was thereafter to be and was executed and delivered to plaintiffs.

After the signatures were so attached to the note and mortgage, Dosek wanted the abstracts to plaintiffs' land in order to complete the transaction, so plaintiffs agreed

to meet Dosek and Bayer at plaintiffs' bank in Hemingford the next morning and get the abstracts for Dosek. They met there as agreed, where plaintiff went into the bank, brought the abstracts out, and handed them to Dosek who said he would mail back to plaintiffs the necessary papers to complete the transaction. Upon a previous occasion, plaintiff had experienced the giving of a note and mortgage on land to another insurance company, but such mortgage had been paid. When Dosek got plaintiffs' abstracts, plaintiff knew that defendant would keep them until plaintiffs' note and mortgage were paid. Plaintiff knew that he was giving a $30,000 note and mortgage for the defendant's surplus note for a like amount, and that the blank spaces on plaintiffs' note and mortgage would be filled in after plaintiffs signed them. In that connection, there is no specific evidence disclosing what authority Dosek was actually given with regard to filling in the blanks on the note and mortgage, but there is no competent evidence that Dosek was not authorized to date said instruments as of January 2, 1951, nor that he exceeded his authority in filling out the blanks, except it is conclusive that Dosek's purported acknowledgment by plaintiffs on the mortgage was never authorized or taken in any manner whatever as required by law. Plaintiffs always knew that they were to pay $600 interest each year on their note and mortgage, and they did so to and including 1955. They also knew that they would receive $1,800 interest each year on defendant's surplus note which would be a clear profit to them of $1,200 a year, or $100 a month. In that connection, also, plaintiffs always received the $1,800 a year from defendant about the middle of March until 1955, when its payment was a little late, so they drove to Lincoln to see about its payment. There they met Dosek, who handed plaintiffs the defendant's check for $1,800, dated March 31, 1955, and made excuses for its delay of delivery. Plaintiffs cashed that check April 2, 1955. At that time, Dosek also

handed plaintiffs a letter dated March 1, 1955, which enclosed that check, and said: "We might say, that we enjoyed a very nice year, business wise in 1954 and from indications expect to make a better record in 1955."

Thereafter, in a letter dated June 1, 1955, and admittedly received by plaintiffs on June 2, 1955, one Carroll R. Pauley, then the new president of defendant company, introduced himself as such, and as the representative of the largest investment group in defendant company and as a minority member of the then board of directors. He then informed plaintiffs that during April the Department of Insurance had made an exhaustive study of defendant's books and had advised that the department would not issue defendant a license to operate "primarily· because of its impaired financial structure and perilous underwriting practices * * * that the Department could see no other way but to take the company to court and ask for a receivership and eventual termination of business." Pauley then informed plaintiffs that as a less costly alternative, his attorney (who had theretofore been a member of defendant's board and its attorney), proposed to the department that Pauley's investment group furnish whatever additional capital was needed; that the old management resign; that new directors and officers be elected, with an attempt made by them to reestablish the company; that. after considerable hesitation the department consented to such alternative plan; and that on May 23, 1955, a board of directors' meeting was held, with the Director of Insurance and the attorney for the department present, whereat defendant's former officers and directors resigned and new named officers were elected. Plaintiffs were also informed that at the same meeting, the new board voted to move the company's offices from 1311 M Street where the company was paying $200 a month rent, to 945 South Twenty-seventh Street, Pauley Lumber Company offices, on a rent-free

rental basis; and that such board had also voted to accept president Pauley's offer of time and efforts in behalf of defendant company for the remainder of the year without remuneration, in order to save $500 a month theretofore paid to Dosek, the former president. We point out here also the record discloses that the new president then invested $5,700 in a surplus note of the company to give defendant necessary capital in order to operate, which then made the Pauley interests have a total of $69,700 invested in defendant company.

Such letter then pointed out that it would seem much progress had been made, but much remained to be done; sought the loyal support of everyone still connected with the company during the months of transition; and stated that with favorable loss experience and their backing, they all stood a good chance of working out without loss. Pauley also told plaintiffs that if they had any further questions, "please do not hesitate to contact me and I will answer them to the best of my ability. In the event you would rather receive more professional answers * * * the Director of Insurance * * * has advised me that he will be happy to talk with you regarding your company—its past, present and future at any time convenient with you." The letter went on to say that it was addressed to plaintiffs on the theory that they were holders of a surplus note, but the records of the company were so indefinite on that subject, as well as on many others, that Pauley was not entirely certain who the surplus note holders were, or the amounts thereof. Thus, Pauley asked plaintiffs to inform him whether or not they were note holders, and if so, to give him the dates and amounts thereof.

Plaintiff saw Bayer and discussed that letter with him shortly after plaintiffs received it. Plaintiff then said: " 'It looks kind of bad.' " Bayer agreed with him. As a matter of fact, the record discloses, as shown by records from the Department of Insurance and other

evidence as well, that the company had been mismanaged and was in a questionable financial condition as far back as March 1947.

Be that as it may, on June 27, 1955, plaintiff wrote defendant and Pauley, its new president, in reply to his letter of June 1, 1955, saying: "We do hold a Surplus Note, for the amount of $30,000.00, Thirty Thousand Dollars, Dated April 18, 1951. Hope that everything will be for the better in the future for the company. It was a surprise to hear that the company was in a run down way like that." Also, sometime in June, plaintiff and Bayer had a conference with Pauley, the president, who stated that loss to investors would be about 25 percent.

In that connection, on September 12, 1955, plaintiffs admittedly received a letter from defendant, signed by Pauley as president, informing plaintiffs that the directors had determined that circumstances over which they had no control "require the discontinuance of further operations of the company at the earliest possible date." Reasons given therefor were defendant's liability upon certain bonds furnished contractors whose solvency had become impaired; that defendant's liabilities were about $45,000, with resources of only $16,000 or $17,000 to meet them; and that there were several other unreinsured bonds which were questionable and might become a cash liability at any time. Also, sometime in September 1955, Pauley told plaintiff that the loss of investors would be about 50 percent.

Plaintiff was in Lincoln at least three times during 1956 to inquire further about defendant's condition and affairs. The first time was in January 1956, when he went to the Department of Insurance and to see Pauley. A reputable lawyer employed by plaintiffs went with him. Among other things, the Director of the Department of Insurance told them that he would not let Dosek operate the company under any circumstances, as they suggested. In that connection, Pauley told them

"absolutely not." Nevertheless, plaintiff, together with his brother, who also was a surplus note holder, and plaintiffs' lawyer, went to a Chamber of Commerce luncheon with Dosek. They then went back to Dosek's office, where they talked about reviving the company and helping Dosek get control thereof in order to get the company going again.

In that connection, about April 14, 1956, plaintiffs received a copy of a typed letter from Dosek, purportedly signed by plaintiff but with Dosek's initials appended to the signature. Such letter read: "I am a substantial investor as well as a member in the Lincoln Bonding & Insurance Co. I understand that you are also an investor so invite you to a meeting to be held Thursday evening in the English room of Hotel Lincoln at 7:30 April 19, 1956." At the end of such letter, Dosek wrote in his own hand as follows: "Dear Emery: Here is a copy of letter that was sent. Lets get together earlier in the afternoon to talk matters over." With regard thereto, plaintiff testified that he did not sign the letter and did not know that it was sent out under his name, but that he did nothing about the fact that it did go out under his name because he was after "something better." He attended the meeting but did not inform anyone that he had not called it, and did not lead the discussion as Dosek wanted him to do. There were several people there, including two reputable lawyers who represented plaintiffs, and with whom plaintiffs had theretofore consulted about defendant's condition and affairs. The condition of "the company and a few things" were discussed at the meeting and Dosek made a talk about getting control of and reviving the company.

In October 1956, Dosek tried to scare plaintiff by telling him that Pauley had got his securities out of the company and left plaintiffs holding the sack with only questionable mortgages remaining in the company, whereupon plaintiff consulted with another reputable

lawyer, who as late as July 5, 1957, some 4 months after plaintiffs had attempted to rescind, wrote plaintiff that after several conferences with the insurance commissioner regarding plaintiffs' surplus note and the possibility of making collection upon it from defendant, it appeared that the company was not operating on a good basis and the commissioner had suggested that at a conference with him in September he could better determine what should be done in the matter. Here is a proper place to say that plaintiffs' argument that the lawyers employed and consulted with by plaintiffs represented Dosek without plaintiffs' knowledge is not supported by a shred of evidence in this record. Rather, the record is entirely devoid of any conclusion except that they represented only plaintiffs and that they did so in an entirely ethical manner. In that connection, there is not much that lawyers can do to help people who are determined to continue to receive something for nothing regardless of known facts and advice with regard thereto.

With reference to Dosek's information that Pauley had left plaintiffs holding the sack, the record discloses that on April 17, 1951, a mortgage executed by Pauley Lumber Company to C. R. Pauley, on January 4, 1940, and assigned to Merchants Casualty Company, now Lincoln Bonding and Insurance Company, on February 3, 1940, was duly released of record by defendant as "settled and paid." Also, on November 20, 1951, a mortgage executed on January 4, 1940, by Carroll R. Pauley and his wife to L. H. Pauley, who assigned it to the company on January 4, 1940, was duly released of record by defendant as "settled and paid." However, it is undisputed that such transactions were made without any knowledge by Pauley at the time that such mortgages were partly replaced in the Department of Insurance by plaintiffs' note and mortgage, and in any event the transactions still left the Pauley interests with an investment of $64,000 in surplus notes of defendant, and

no act of Pauley is shown to have been responsible for the company's mismanagement and its financial condition or failure. As a matter of fact, as heretofore mentioned, Pauley, as president, advanced $5,700 more money in order to permit the company to operate, and in good faith attempted to salvage the losses of investors, including plaintiffs and the Pauley interests.

In the meantime, on January 23, 1956, defendant notified plaintiff in writing that the interest of $600, due and payable January 2, 1956, on plaintiffs' note and mortgage, was unpaid; that defendant, being in a serious financial condition, with large losses, had no earnings with which to pay plaintiffs the interest on defendant's surplus note; and that it was necessary to ask plaintiffs to pay the interest on their note and mortgage without being able to send them a check for interest on defendant's surplus note. Plaintiffs were also told that although partial recovery was possible, a total recovery was improbable, and it appeared that all investors would suffer severe losses.

Plaintiffs, not having paid the interest on their note and mortgage, Pauley, as president, again wrote plaintiff May 2, 1956. Therein reference was made to conversations in Pauley's office on April 20, 1956, regarding plaintiffs' mortgage, then plaintiff's attention was called to the fact that the interest on plaintiffs' note and mortgage for 1955 was unpaid; that all other investors had suffered substantial cash losses; and that plaintiff should see the importance of forwarding to defendant the 1955 interest of $600 within the next few days to supply funds necessary for use in the "orderly dissolution proceedings of the company."

Thereafter, on May 8, 1956, plaintiff wrote to defendant, enclosing a $600 check for plaintiffs' 1955 interest on their note and mortgage. In that letter, plaintiff said that he was "sorry to be so slow," that "I just can't get this thing off my mind. I hope that things will get little better and that we could recover some of those

losses. I hope the meeting with my lawyer * * * and others did not put you out to (sic) much he wrote me a letter about being there. Most what I already new (sic) after meeting with you when I was in Lincoln."

On December 3, 1956, Pauley, as president, wrote plaintiffs that: "Another year is about to close and that means another interest payment of $600.00 will be due on your note and mortgage as of January 2, 1957. We have nothing particularly new to report but will send you a statement of our position sometime during January or February." Again on January 28, 1957, Pauley, as president, wrote plaintiff stating that: "Having just made the $600.00 payment covering the 1956 interest on" a mortgage owing defendant, "reminds me that your payment for the same period and in the same amount has not yet been received. Please advise me as to when this may be expected. You no doubt noted from the annual report, that" defendant "is still involved in paying losses, although they now appear to be on the downgrade. Surely 1957 will see the conclusion of most if not all loss payments other than those involving health and accident policies."

In that connection, we find no competent evidence in this record which would support plaintiffs' contention that defendant's officers lulled plaintiffs into a sense of security and thereby prevented them from learning all the facts until shortly before they decided to rescind on February 5, 1957, and attempted to do so by making a tender on March 1, 1957, before this action was filed March 14, 1957, which was 6 years after the original transaction and some 21 months after plaintiffs admittedly learned facts which put them upon inquiry. It is also just as obvious from this record that plaintiffs actually did discover the alleged fraud many months before they attempted to rescind in any manner. Further, after such discovery plaintiffs took steps to put Dosek back in control of the company so that the original transaction could be carried out, and recog-

nized validity of the transaction by paying interest on their note and mortgage as late as May 8, 1956, yet took no steps to rescind for almost a year thereafter.

We are convinced that plaintiffs alleged and proved by a preponderance of the evidence what material representations were made; that they were false and so known to be by the party charged with making them, or else were made by him without knowledge as a positive statement of known fact; that plaintiffs believed them to be true; that plaintiffs relied thereon as they had a right to do; and that plaintiffs were injured thereby. We discussed and passed upon such matters at length in Russo v. Williams, 160 Neb. 564, 71 N. W. 2d 131, wherein we also held: "Whether the right of one party to a contract to rescind the same arises on account of fraud inducing the contract or on account of a breach by the other party of a dependent covenant, such right is barred by failure of the one party, for an unreasonable time after knowledge of the facts giving rise to such right, to declare a rescission and disclaim the benefits of the contract.

"The question whether laches exists in a particular case depends upon its own peculiar circumstances and is addressed to the sound discretion of the court, the question of the unreasonableness of the delay depending largely upon the nature of the property in the particular case." As recently as Caruso v. Moy, 164 Neb. 68, 81 N. W. 2d 826, we reaffirmed those rules.

Also, as early as Ensign v. Citizens Interurban Ry. Co., 92 Neb. 363, 138 N. W. 718, this court said: " 'It is a principle which has been too long and too thoroughly established in our law to admit of any doubt or discussion, either as to the principle itself or the reasons upon which it is founded, that a party claiming to rescind a contract on the ground of fraud must do so promptly upon discovery of the facts, and that if he delays, or takes any further steps in the execution of the contract,

or does any act recognizing its validity, after discovery, he loses all right to this particular form of relief.'

"In the case of Grymes v. Sanders, 93 U. S. 55, it was held: 'Where a party desires to rescind, upon the ground of mistake or fraud, he must, upon discovery of the facts, at once announce his purpose, and adhere to it.' The same doctrine was announced by this court in the case of American Building & Loan Ass'n v. Rainbolt, 48 Neb. 434." See, also, the many authorities cited and discussed for this and other jurisdictions in Annotation, 72 A. L. R. pp. 726 to 797 inclusive.

Further, in Hollenbeck v. Guardian Nat. Life Ins. Co., 144 Neb. 684, 14 N. W. 2d 330, this court held: "Where one is put upon inquiry, he is charged with notice of all of such facts as he would have learned by reasonable inquiry." See, also, Durfee v. Keiffer, 168 Neb. 272, 95 N. W. 2d 618. In the light of such rules and the evidence in this record, we conclude that plaintiffs' right to rescind was barred by unreasonable delay.

However, such conclusion does not entirely dispose of the issues presented by the pleadings and evidence. Plaintiffs first argued that their note and mortgage to defendant were void because the transaction occurred on March 15, 1951, and the instruments were materially altered by filling in the blanks and dating them back to January 2, 1951, to cost plaintiffs more interest. In that connection, plaintiffs did not plead alteration as such, but their petition did allege that the instruments were void, after which defendant's answer and cross-petition denied generally and alleged ratification, after which plaintiffs' reply and answer thereto denied generally. Contrary to defendant's contention here, we conclude that alteration and ratification were issues upon which evidence appearing in this record was admissible. See, Walton Plow Co. v. Campbell, 35 Neb. 173, 52 N. W. 883, 16 L. R. A. 468.

In that connection, on page 5 of plaintiffs' petition, they plead and set forth a complete tabulation of all

interest received by plaintiffs from defendant each year on its surplus note and all interest paid by plaintiffs to defendant each year on their note and mortgage, beginning January 1, 1952, and ending January 1, 1956. The item thus listed under January 1, 1952, was admittedly interest for 1951 for which plaintiffs received only $1,265 and paid to defendant only $426, which conclusively shows an exact adjustment of interest on plaintiffs' note and mortgage and defendant's surplus note to April 18, 1951, the date of defendant's surplus note. Plaintiffs' tabulation also shows that from January 1, 1953, to and including January 1, 1955, plaintiffs received $1,800 interest each year on defendant's surplus note, and that plaintiffs paid defendant $600 interest each year from January 1, 1953, to and including January 1, 1956, on plaintiffs' note and mortgage. Thus it cannot be said that the dates on plaintiffs' note and mortgage were altered to make plaintiffs pay more interest, as argued by plaintiffs.

Plaintiffs also argued that filling in the blanks and dating their note and mortgage January 2, 1951, was a material alteration in any event. In Montgomery v. Dresher, 90 Neb. 632, 134 N. W. 251, 38 L. R. A. N. S. 423, this court held: "The filling of blanks in a written instrument is not, strictly speaking, an alteration of the instrument. Where a blank is filled in after the execution and delivery of a written instrument, it is a question of authority to do so.

"The right to fill blanks in written instruments after execution and delivery is based upon an assumption of consent, in the absence of specific instructions, and the leaving of such blanks is considered to imply authority to fill them, and creates an agency in the receiver to do so in the way contemplated by the maker." See, also, Mutual Benefit Health & Acc. Assn. v. Milder, 152 Neb. 519, 41 N. W. 2d 780; 10 C. J. S., Bills and Notes, § 136, p. 583; 3 C. J. S., Alteration of Instruments, §§ 62, 63, p. 976, § 66, p. 977; § 62-114, R. R. S. 1943.

In Bank of Cedar Bluffs v. Beck, 128 Neb. 244, 258 N. W. 528, 96 A. L. R. 1099, we held: "After a note has been signed and delivered by the maker, if the time of the maturity is altered by the holder without the consent of the maker, this constitutes a material alteration, which releases the maker."

Be that as it may, in State Bank of Edgar v. Jordan, 129 Neb. 19, 260 N. W. 687, we held that: " 'A material alteration, already made, may be ratified and adopted subsequently; and in such case the instrument, as altered, will be binding.' State v. Paxton, 65 Neb. 110.

"Where holder of note that has been materially altered without maker's consent relies on ratification of such alteration, it must be pleaded." See, also, 3 C. J. S., Alteration of Instruments, § 75, p. 981. As said in § 77, p. 983: "Any act or conduct showing an intention to recognize the instrument as altered is generally sufficient to constitute a ratification of the alteration." Also, as said in § 46, p. 961: "A change in an instrument before its complete execution will not ordinarily be considered to be an alteration, although under some circumstances the instrument may be unenforceable for lack of mutual assent."

In the light of this record and the foregoing authorities, we conclude from plaintiffs' own pleadings and the evidence heretofore set forth that plaintiffs ratified the dates of their note and mortgage and that they were not void for alteration thereof.

Plaintiffs also argued that their mortgage was void because when they signed it in blank it did not contain a description of the property to be mortgaged. No authority in point is cited from this jurisdiction, and we have found none. Other authorities relied upon by plaintiffs are distinguishable upon the facts and law of the particular jurisdiction. The description of the property to be mortgaged was left blank, but it is obvious from the evidence that plaintiffs understood and agreed that Dosek had authority to later fill in the

description as he did from the abstracts admittedly furnished Dosek by plaintiffs for that purpose in order to complete the transaction, and authorities heretofore cited adversely dispose of plaintiffs' contention.

Plaintiffs further argued that their mortgage was entirely void because it was never acknowledged as required by law. In the light of holdings in Trowbridge v. Bisson, 153 Neb. 389, 44 N. W. 2d 810, cited with approval in Marston v. Drobny, 166 Neb. 747, 90 N. W. 2d 408, and the undisputed evidence in this record, we conclude that plaintiffs' mortgage, although witnessed, was never acknowledged in any respect as required by law, and that the purported acknowledgment appearing thereon was false. However, that conclusion does not make plaintiffs' mortgage entirely void as between the parties herein. In such respect, plaintiffs' land described in the mortgage, did include the Northeast Quarter of Section 26, Township 27 North, Range 53 in Sioux County, which, without dispute, was plaintiffs' homestead, and the mortgage of such homestead was absolutely void and unenforceable. See Trowbridge v. Bisson, *supra*, which concluded that any conveyance or encumbrance of the homestead of a married person is absolutely void and unenforceable unless voluntarily executed and acknowledged by both husband and wife as required by section 40-104, R. R. S. 1943. However, in the case at bar, the mortgage did describe other lands belonging to plaintiff which were not plaintiffs' homestead, and as between the parties the mortgage was valid and enforceable as to such other lands.

In that connection, on rehearing in Wilson v. Wilson, 85 Neb. 167, 122 N. W. 856, this court, citing many authorities, held: "A deed to real estate, executed and delivered, is valid between the parties, though not lawfully acknowledged nor witnessed, and is sufficient to convey the land described therein, with the exception of the homestead of the grantor." By analogy, of course, such rule applies to a like execution and delivery of a

mortgage on real estate. Citing and quoting from Wilson v. Wilson, *supra*, this court reaffirmed such quoted holding in Blum v. Poppenhagen, 142 Neb. 5, 5 N. W. 2d 99, which involved a deed to real estate and a separate contractual reservation of an interest therein executed at the same time by the same parties for the same purpose in the same transaction. In such respect, citing authorities, we concluded that in the absence of anything to indicate a contrary intention, such instruments were in the eye of the law, one instrument, and would be read and construed together as if they were as much one in form as they are in substance.

Other questions were argued but they require no discussion. We conclude that the judgment of the trial court should be and it hereby is reversed and the cause remanded with directions to make an accounting of the amount due on plaintiffs' note and mortgage, and award defendant a judgment on its cross-petition therefor, together with a foreclosure of the mortgage as prayed, except upon plaintiffs' homestead heretofore described. All costs are taxed to defendant.

REVERSED AND REMANDED WITH DIRECTIONS.

SIMMONS, C. J., not participating.