IN MATTER OF TERMINATION OF PARENTAL RIGHTS TO Jessica KEGEL, a/k/a Jessica Burrell and Rebecca Kegel, a/k/a Rebecca Burrell, Minors: Mary Beth KEGEL, Appellant, v. ONEIDA COUNTY DEPARTMENT OF SOCIAL SERVICES, Respondent.

Supreme Court

*No. 77–186. Submitted on briefs September 7, 1978.—Decided October 31, 1978.*
(Also reported in 271 N.W.2d 114.)

For the appellant the cause was submitted on the briefs of *O'Melia Law Offices, S. C.* of Rhinelander.

For the respondent the cause was submitted on the brief of *Bronson C. La Follette,* attorney general, and *Maryann S. Calef,* assistant attorney general.

CALLOW, J.  The juvenile court[1] terminated Mary Beth Kegel's parental rights to her twin daughters.  On appeal, the circuit court affirmed.  The questions raised are whether the juvenile court's findings are against the great weight and clear preponderance of the evidence and whether the court abused its discretion.

Mary Beth Kegel at age twenty gave birth to twin girls on March 17, 1972, in California.  In July, 1973, while Mary Beth resided in Lac du Flambeau, Vilas County, the Vilas County Court ordered legal custody of the twins transferred to the county Department of Social Services, with physical custody given to Mary Beth's parents, Allison and LaVerne Burrell who resided in Lac du Flambeau.  In November, 1973, Mary Beth moved to Oneida County, and physical custody was restored to her.

In February, 1974, Mary Beth was arrested on a forgery warrant in Waushara County.  On March 6, 1974, Mary Beth pleaded guilty to two counts of forgery and was placed on probation and ordered to pay $150 restitution.  The Oneida County Department of Social Ser-

---

[1] *See:* Sec. 48.03, Stats.

vices (hereinafter the department) arranged for foster care of the children while Mary Beth was in jail because apparently she could not make bail. The department petitioned the juvenile court for a determination that the children were neglected. After a hearing the court ordered that temporary legal custody be given to the department and physical custody was to continue in a foster home until Mary Beth established living conditions meeting the department's standards. On June 27, 1974, the children were returned to Mary Beth. From the time of her arrest until June 27, Mary Beth visited the children once. She called the foster home on two other occasions to arrange a visit, but was told that it must be arranged through the department.

Mary Beth retained physical custody of the twins for two months, though the children spent a total of at least half that time with the Burrells, usually at Mary Beth's request. On August 28, 1974, while the Burrells were living in the Milwaukee area, Mrs. Burrell noticed bruises on the children and took them to a Milwaukee hospital. The hospital notified the department that the bruises appeared to be from nonaccidental causes. Mrs. Burrell told a social worker from the department that when she picked the children up she noticed that the house was dirty and that Mary Beth had a black eye which may have been caused by her boyfriend. The department transferred the children's physical custody to the Burrells. There was never a determination of child abuse.

In March, 1975, Mary Beth petitioned the juvenile court for voluntary termination of her parental rights. She withdrew the petition at the time of the hearing. On April 10, 1975, the court extended legal custody to the department for another year. The court order gave physical custody to the Burrells, to be transferred to

Mary Beth upon her maintaining a home which met the department's approval.

The department furnished Mary Beth with a list of requirements to be met before the children would be returned. These included (1) improving certain conditions at the house, (2) making her restitution payments, and (3) visiting the children regularly. In July, 1975, the Burrells moved with the children from the Milwaukee area back to Lac du Flambeau, about 150 miles from Wild Rose where Mary Beth lived. The department offered financial assistance so she could visit the twins weekly. She used such assistance to visit on September 20 and October 25, 1975.

By letter of November 10, 1975, the department changed the visitation schedule to twice a month, with the understanding that if Mary Beth complied with the schedule the department would recommend to the court that physical custody be transferred to Mary Beth. Mary Beth visited once in December, twice in January, and twice in February, 1976.

On April 7, 1976, the department petitioned the juvenile court for the termination of Mary Beth's parental rights to her children, and a hearing was held June 30, 1976. A guardian ad litem had been appointed for the children.

After the hearing the guardian ad litem recommended that Mary Beth's parental rights be left intact and that legal custody of the children remain with the department. From the bench the court decided that Mary Beth's parental rights would be terminated, legal custody would be continued in the department, and physical custody would remain with the Burrells. In a written order dated July 21, 1976, the court ordered legal custody transferred to the Burrells.

Mary Beth and the guardian ad litem appealed to the circuit court pursuant to sec. 48.47, Stats. On Decem-

ber 7, 1976, the circuit court remanded the case to the juvenile court for written findings, conclusions, and a judgment. The juvenile court issued a written order terminating Mary Beth's parental rights, based on written findings and conclusions, on March 23, 1977, nunc pro tunc June 30, 1976.

On May 24, 1977, the circuit court affirmed the juvenile court's order. Mary Beth appeals.

The scope of appellate review of a juvenile court order terminating parental rights is limited to two questions:

(1) Are the juvenile court's findings against the great weight and clear preponderance of the evidence?

(2) Did the juvenile court abuse its discretion in ordering Mary Beth's parental rights terminated?

*See: In re Johnson*, 9 Wis.2d 65, 75–6, 100 N.W.2d 383 (1960). We review the circuit court's order affirming the juvenile court's order in light of this standard.

The termination order is statutorily grounded in the determination that Mary Beth "has substantially and continuously refused and neglected to give the minor children the parental care and protection necessary for their health, morals and well being, pursuant to Section 48.40(2)(b) of the Statutes."[2] The juvenile court concluded that "Mary Beth Kegel has established an attitude of almost full indifference toward her minor children and . . . this constitutes a substantial omission of pa-

[2] Sec. 48.40(2)(b), Stats., provides:

"**Grounds for termination of parental rights.** The court may, upon petition, terminate all rights of parents to a minor in any of the following cases: . . .

"(2) If it finds that one or more of the following conditions exist: . . .

"(b) That the parents have substantially or continuously or repeatedly refused or neglected or are unable for a prolonged indeterminate period to give the minor the parental care and protection necessary for his health, morals or well-being."

rental responsibilities." This conclusion, in turn, rests primarily on the court's Finding No. 6g which states:

"Mary Beth Kegel has failed to establish a suitable living arrangement as required by the Oneida County Department of Social Services and as also required by this Court, which failure was shown in part by her vacillation as to whether or not she wanted to keep the children or place them with someone else, as a review of the entire proceedings herein will indicate, and which vacillation is further shown by the fact that she rarely saw the children with the record indicating that she saw the children only once between February 26, 1974 and June 27, 1974, and no more than 19 days between June 27, 1974 and August 29, 1974, and between August 29, 1974 and February, 1976, she saw the children only occasionally and on an irregular basis, and that she has not seen the children at all between February 6, 1976 and the date of this hearing; and which vacillation is further indicated by her course of conduct over a period of approximately 2½ years which shows she was unable to determine whether the children should be placed with her or with someone else."

Mary Beth argues that the evidence does not support this finding on which the conclusion of parental indifference rests. Her position is based on two considerations: (1) There was evidence that she was improving; and (2) the evidence disclosed reasons for Mary Beth's failure to visit the children more often.

Mary Beth points out that most of the testimony concerned past events and ignored present conditions. A department social worker who testified had not visited Mary Beth during the year before the hearing; a police investigator had not seen her for eighteen months; an employer and fellow employee had not seen her for nine months before the hearing; and her parents, the Burrells, had not visited her home for a year. Mary Beth notes that she maintained a job for three months before the hearing and lived in the same house for two years.

She argues that the evidence showed her house to be acceptable and that a social worker testified that she could not give a professional opinion, on the basis of testimony adduced at the hearing, that Mary Beth had no possibility as a mother.

Despite the evidence tending to show her improvement, it cannot be said that the juvenile court's findings were against the great weight and clear preponderance of the evidence. The court observed Mary Beth and heard her testimony. The court noted in its findings that Mary Beth admitted she had used LSD, mescaline, and marijuana, and the latter as recently as five months prior to the hearing. While the department social worker may not have been to visit Mary Beth at her home for a year, there was continuous correspondence between them. Mary Beth's mother testified that in the four months preceding the hearing Mary Beth came to visit the children only once. Concerning Mary Beth, the juvenile court observed:

"Her actions speak louder than her words. The issue here is not one of whether the house was dirty or whether it was clean, whether the grandparents made more money and provided steak for the children and Mrs. Kegel provided potatoes. The issue is one of attitude, and it is difficult for the Court to judge what the attitude of a person is."

Because Mary Beth's attitude is crucial to the court's determination that her parental rights should be terminated under sec. 48.40(2)(b), Stats., it is appropriate that the circuit court defer to the juvenile court's findings. There was ample evidence of her vacillation as to whether she wanted the children which included her petition to the court for voluntary termination of her parental rights which she withdrew at the time of the hearing. Her questionable interest in the children was affirmed by her failure to make regular visits. Out-

ward signs of improvement do not render this evidence any less compelling.

Second, Mary Beth argues that her failure to visit more often is explainable by car trouble, bad weather, and the antagonistic conditions between her and her parents. However, the department offered financial assistance to facilitate the visits and planned for the children to visit at Mary Beth's home provided she first made regular visits at the Burrell's twice a month for two months. The evidence shows that the department was solicitous of Mary Beth's needs and reasonable in its expectations of her. Her proffered explanations do not affect the validity of the findings or conclusions. We conclude the juvenile court's findings are not against the great weight and clear preponderance of the evidence.

The second question presented is whether the court abused its discretion in terminating Mary Beth's rights. The juvenile court's exercise of discretion is guided by the children's best interests. Sec. 48.01(3), Stats., *In re Johnson, supra* at 75. Mary Beth challenges two aspects of the court's exercise of discretion.

First, she argues that after the circuit court remanded the case to the juvenile court for written findings, conclusions, and a judgment the juvenile court abused its discretion when it did not take additional testimony on the current circumstances but simply drafted the findings on the basis of testimony taken nine months earlier. There is no abuse of discretion here. The findings and conclusions were amply supported by the evidence adduced at the hearing. The remand order was to cure a formal, but important, defect in the proceedings and did not require that additional evidence be taken.

Second, Mary Beth challenges the court's order on the ground that it was against the recommendation of the

guardian ad litem. While the legislature has not specifically mandated appointment of a guardian ad litem for the minor children in cases involving termination of parental rights, clearly it was appropriate here because the ultimate question was whether termination served the children's best interests.

The role of the guardian ad litem in actions affecting marriage was extensively reviewed in *de Montigny v. de Montigny*, 70 Wis.2d 131, 136–142, 233 N.W.2d 463 (1975). The court emphasized that the guardian ad litem is no less than the attorney for the children and their interests; his or her purpose is the determination of the child's best interests. The recommendation of a guardian ad litem who has performed his or her duties carefully and responsibly should not be lightly overridden by the court. Sec. 48.85(2), Stats., provides that in adoption cases the guardian ad litem's recommendation shall be presumed to be in the child's best interest unless the fair preponderence of the evidence is to the contrary.

Thus, this court has carefully reviewed the recommendations and the evidence to ascertain whether the juvenile court abused its discretion in failing to abide by the recommendation of the guardian ad litem. The guardian ad litem recommended that custody remain with the department but that Mary Beth's parental rights not be severed. He based this recommendation on his belief that Mary Beth's home would not be an appropriate environment for the children and that the Burrells were adequately taking care of them. He did not recommend termination because he believed that Mary Beth expressed an interest in and love for the children.

The decision to terminate parental rights involves an evaluation of the sometimes competing interests of child and parent. Sec. 48.01(3), Stats., provides: "The best interests of the child shall always be of paramount con-

sideration, but the court shall also consider the interest of the parents or guardian of the child and the interest of the public."

This court examined the meaning of the child's "best interests" in *Adoption of Tachick*, 60 Wis.2d 540, 546–56, 210 N.W.2d 865 (1973):

"At one time, the courts paid less attention to the psychological trauma attendant upon disturbing the continuity of a child's environment than the courts do today. Some courts today have gone to the extreme and have held this factor to be controlling in adoption. It has been said by a noted psychiatrist that the stability of environment is far more crucial than its precise nature and content.

"The literature on the problem of separation trauma of a young child is vast and interesting. It is stated the important thing is not the mother in a biological sense but the mother figure, for it is the mother figure with which the child becomes totally identified and it is the mother figure whoever that might be that the child constantly turns to for nourishment and other physical comforts, love and security." [Citations and footnotes omitted.] 60 Wis.2d at 553–54.

The evidence in this case and the previous pronouncements by this court as to what is in the best interests of the child strongly suggest that the juvenile court's order is better designed to achieve the children's best interests than the recommendation of the guardian ad litem. Mary Beth's lack of perception of parental responsibilities, in spite of two years of supervision, is demonstrated by her testimony that, if she were given custody of the children, her boyfriend would provide the male image she deemed necessary for the children. This is the same boyfriend with whom she had shared living accommodations for almost two years, who had given her a black eye, who the children said had always hit them and threw them in bed, and who shared the residence with Mary Beth and the children which was so bad

that Mrs. Burrell found maggots in the dirty clothes when she picked up the children and found them to be so badly bruised she took them to a hospital where their injuries were diagnosed to be of a nonaccidental nature. Holding the case open to give Mary Beth additional time to prepare for parenthood would only disturb the sense of continuity important to child development.

Mr. Burrell testified that during visitation Mary Beth would tell the twins false stories about acquiring a farm and horses which would upset the twins for several days. He felt a final decision should be made to eliminate Mary Beth's standing to exercise control over the children. Following Mr. Burrell's comments about his affection and concern for his daughter, Mary Beth's attorney asked Mr. Burrell, "Yet you apparently want the Court to make a determination that she will forever be prohibited from having the children." Mr. Burrell responded, "That is the one way we can keep this wrangling from going back and forth. That is the only thing to do. From all indications it won't change anything."

At the time of the hearing, the children were four years of age. They had spent the vast majority of their lives in the care of the Burrells, and any stability in their lives have been provided by the Burrells. Mrs. Burrell testified that the children called her "mum" and her husband "dad." She testified the twins would occasionally ask any young woman if she was their mother. Mary Beth testified that, while the children knew who she was, they called Mrs. Burrell "mother." The Burrells provided food, clothing, and shelter for the twins for almost two continuous years before the hearing. Though the legislature in sec. 48.01(3), Stats., recognized that a parent's interest is a proper subject of consideration in child placement cases, the weight to be given to Mary Beth's asserted interest is far outweighed here by the twins' paramount need for a stable environment. The evidence

strongly supports the conclusion of the juvenile court judge that the twins' best interests would be served by termination of Mary Beth's parental rights, enabling final placement of the children.

We conclude the juvenile court did not abuse its discretion in ordering Mary Beth's parental rights terminated despite the contrary recommendation of the guardian ad litem.

*By the Court.*—Order affirmed.

SHIRLEY S. ABRAHAMSON, J. (*dissenting*): I am willing to concede, for the purposes of this dissent, that the juvenile court's finding that the mother "has substantially and continuously refused and neglected to give the minor children the parental care and protection necessary for their health, morals and well being, pursuant to section 48.40 (2) (b) of the Statutes" is not against the great weight and clear preponderance of the evidence. This concession may appear to end the matter since one would think that a judicial decision which is supported by substantial evidence could not be arbitrary or capricious. However, this court has held that the mere existence of a statutory ground for termination of parental rights cannot alone justify the court's ordering termination. As the majority opinion explains, the trial court must take a further step. The trial court "must consider all the circumstances and exercise its sound discretion as to whether termination would promote the best interests of the child." *In re Johnson*, 9 Wis.2d 65, 75, 100 N.W.2d 383 (1960).

The majority states that the trial court order terminating parental rights is better designed to promote the best interests of the children than the guardian *ad litem's* recommendation that the mother's rights not be terminated. I concede that the facts which the court recites in

support of this conclusion clearly substantiate the court's earlier order removing the children from the physical custody of the mother; but the facts do not support termination of the mother's parental rights. The facts relied on by the majority to support termination of parental rights occurred for the most part prior to the court's transfer of physical custody to the grandparents. There is no evidence in the record of events occurring after the transfer of custody which necessitates or permits the court's termination of the mother's parental rights.

The record shows that since April 30, 1974, the children have resided with their maternal grandparents and that the children have been well provided for. The record does not establish that the mother's conduct or relationship with the children—admittedly poor—was harmful to the children during the period they resided with the grandparents. Nevertheless the majority holds that termination is in the best interests of the children and necessary for the "sense of continuity important to child development."

This holding is fallacious on two grounds. First, the majority mistakenly places unquestioning reliance on the importance of "continuity of relationship" and the "psychological parent-child" relationship. The supposedly paramount importance of the continuity of the psychological parent-child relationship was propounded in Goldstein, Freud & Solnit, *Beyond the Best Interests of the Child* (1973). This theory is the subject of great controversy. *See, e.g.,* Kadushin, *Beyond the Best Interests of the Child: An Essay Review,* 48 Soc. Sci. Rev. 508 (1974); *Smith v. Offer,* 431 U.S. 816, 844 n. 52 (1977). Yet the majority appears to accept the theory not only without hesitation but also without the benefit of any expert or other opinion or testimony about the theory or its application to the facts of this case.

Second, the majority's holding that termination would strengthen the children's "sense of continuity and stability" is unsupported by the record. The trial court, after finding that a ground for termination existed, simply concluded that it was in the best interests of the children to terminate parental rights. The trial court did not explain or justify its conclusion; it did not consider the significance of the continuity of relationship. This court has held that a decision which requires the exercise of discretion and which on its face demonstrates no consideration of any of the factors on which the decision should be properly based constitutes an abuse of discretion as a matter of law. *McCleary v. State,* 49 Wis.2d 263, 278, 182 N.W.2d 512 (1971). The court is obliged, however, to uphold a discretionary decision of a trial court if, from the record, it can conclude that there are facts of record which would support the trial judge's decision had discretion been exercised on the basis of those facts. *Klimas v. State,* 75 Wis.2d 244, 247, 249 N.W.2d 285 (1977) ; *Maier Const., Inc. v. Ryan,* 81 Wis.2d 463, 473 260 N.W.2d 700 (1978).

Reviewing the record, I find no facts adequate to support the conclusion that termination of the mother's rights will strengthen the children's sense of continuity.

It is probable that if physical custody continued in the grandparents the mother's relationship with the children would continue whether or not her parental rights were terminated. It is hard to believe that the mother would be barred forever from visiting her parents' home. Indeed the maternal grandfather testified that he prayed his daughter (the children's mother) would improve her way of life. He said that if in the future his daughter changed and she wanted the children back she should have them: "Children belong to their real full parents. They belong to them until the end of their days. I believe that." The maternal grandmother also testified that

if her daughter changed, she should be given the chance to see the children.

A witness made passing reference to the "possibility of disruption" of the children unless the mother's rights were terminated. The disruption in the children's sense of continuity and stability, and in their lives generally, had already been substantially decreased by the award of their physical custody to their grandparents. The record fails to show that the disruption would be further decreased by the termination of their mother's legal rights.

Terminating the mother's parental rights did not clear the way for final placement of the children. The record indicates that the rights of the father had not yet been terminated and that no proceedings of termination had yet been commenced. *See* secs. 48.425(5), (6n), Stats. Thus the mother's rights have been terminated but the children cannot yet be finally placed. At some future time these children could be removed from the grandparents, and could be placed with another family on a temporary or permanent basis. The court's action did not assure continuity and stability for the children.

The power to terminate parental rights, the power to sever permanently the legal ties between parent and child, is an awesome governmental power. Such power should be exercised with restraint. The record in this case justifies the court's continuing the children in the physical custody of their maternal grandparents. But the record does not establish that it is in the best interests of the children that the mother's parental rights be terminated.

I am authorized to state that Mr. Justice HEFFER-NAN and Mr. Justice DAY join in this dissenting opinion.