ADOPTION OF TACHICK: SHEHOW and wife, Appellants, v. PLIER, Guardian *ad litem*, Respondent.

*No. 301. Argued September 5, 1973.—Decided October 15, 1973.*
(Also reported in 210 N. W. 2d 865.)

For the appellants there was a brief by *Gregory B. Conway*, and *Cohen, Grant, Liebmann & Conway, Ltd.*, all of Green Bay, and oral argument by *Gregory B. Conway*.

For the respondent there was a brief by *Plier Law Office* and *Douglas W. Plier* of Oconto, and oral argument by *Douglas W. Plier*.

HALLOWS, C. J. Procedurally, the issue comes to us in the following context. On March 29, 1970, fifteen-year-old Miss Althea Tachick gave birth to a baby boy in a hospital in Oconto Falls. The child was named LeRoy Edward after his father. For some time prior to the birth of the child, Althea Tachick lived in the home of the Shehows, the parents of the father of the child, and returned there after the child's birth with the new-born baby. After some four or five months, Miss Tachick returned to the home of her mother, leaving the baby with the Shehows, with whom he still resides.

Prior to the birth of the child, Althea Tachick informed the Oconto County Department of Social Services of her intention to reside with the parents of the child's father after the birth of the child. Some eight months after the birth, the department made an investigative report in respect to the termination of the parental rights of the mother to the child. On March 9, 1972, about two years after the birth of the child, a termination of parental rights hearing was held in the Oconto county court. Both the mother and the father of the child were present. LeRoy Edward Shehow admitted under oath that he was

the father of the child and signed a form of consent to the termination of his rights. During the hearing the mother stated she was willing to have her parental rights terminated on the condition the child would be adopted by the Shehows, who desired to adopt him. She was told her consent could not be so conditioned, and over her objection the court terminated her rights and entered an order pursuant to sec. 48.40 (2) (b), Stats. Contrary to the recommendation of the department, the court allowed the child to remain in the Shehow home pending the outcome of a petition for adoption, which was filed by the Shehows on March 15, 1972. The adoption was opposed by the department of health & social services of Oconto county, Wisconsin department of health & social services, and Douglas W. Plier, the respondent, who was appointed guardian *ad litem* for the child.

A trial was had on the petition on August 16, 1972. The court made findings of fact and conclusions of law and filed a written decision, which was the basis for the court's judgment denying the petition.

The basic question is whether the trial court's conclusion that the proposed adoption would not be in the best interests of the child is correct. We think the court erred in so concluding, but before discussing what constitutes best interests of the child for adoption purposes, we point out that nowhere in the Children's Code is there a definition of "best interests of the child." Likewise, the case law of this state is quite barren of definite guidelines or factors which constitute the concept of "best interests." *See State ex rel. Lewis v. Lutheran Social Services* (1973), 59 Wis. 2d 1, 207 N. W. 2d 826.

It is argued on this appeal that the trial court erred because it relied on sec. 48.85, Stats. 1957, and granted too much weight to the objection of the guardian *ad litem* to the adoption. We do not consider the court rested its decision on sec. 48.85, Stats. 1957, which has been repealed.

While the court referred to the recommendation as not being made arbitrarily or capriciously, this was merely a passing reference and not the ground for its decision.

Under the present sec. 48.85, Stats. 1971,[1] a guardian's recommendation is presumed to be in the best interests of the child unless the fair preponderance of the credible evidence is to the contrary. When the guardian's recommendation is opposed to granting of the petition for adoption, the court is required to take testimony to determine whether the proposed adoption is in the best interests of the child. It is also provided in sec. 48.91 (2), Stats. 1971,[2] that the court must make a finding that the adoption is for the best interests of the child before it makes an order granting the adoption. That procedure was followed in this case.

It is true the guardian *ad litem's* recommendation opposing the adoption does not have the force and effect under present sec. 48.85 (2) that it formerly had. At one time the trial court in an adoption proceeding could not grant the petition over the objection of the guardian *ad litem*. This restriction found its origin in sec. 322.04 (1), Stats. 1953. It was held in *Adoption of Tschudy*

---

[1] "48.85 **Recommendation of guardian.** (1) At least 10 days prior to the hearing, the guardian shall file its recommendation with the court.

"(2) The guardian's recommendation shall be presumed to be in the best interests of the child unless the fair preponderance of the credible evidence is to the contrary. If the guardian's recommendation is in opposition to the granting of the petition, the court shall take testimony as to whether or not the proposed adoption is in the best interests of the child.

"(3) At the conclusion of the hearing, the court shall enter its order in accordance with s. 48.91 (2)."

[2] "48.91 Hearing; order. . . .

"(2) If after the hearing and a study of the report required by s. 48.88 and the recommendation required by s. 48.89, the court is satisfied that the necessary consents or recommendations have been filed and that the adoption is in the best interests of the child, the court shall make an order granting the adoption. The order may change the name of the minor to that requested by petitioners."

(1954), 267 Wis. 272, 65 N. W. 2d 17, in construing this statute that the court was without jurisdiction to review the guardian's refusal to consent and could not grant an adoption petition over the objection of the guardian. However, in 1955 the legislature adopted sec. 48.85 which provided the court could waive the requirement of a guardian's consent to the proposed adoption if it found the guardian's refusal to consent was arbitrary, capricious, or not based on substantial evidence. Under this section when a guardian of a child refused to consent to the proposed adoption, the guardian was obliged to file with the court a summary of his reasons for withholding consent and the court had the option of either dismissing the petition or having a hearing to determine whether the court might waive the requirement of the guardian's consent.

In *Adoption of Shields* (1958), 4 Wis. 2d 219, 89 N. W. 2d 827, the court held a guardian's consent to adoption could be dispensed with only where the evidence disclosed either that the guardian's refusal was not based on a bona fide belief that such refusal was for the best interests of the child or the guardian had no reasonable basis in fact for believing that the proposed adoption would be contrary to the child's best interests. Under these two decisions the court could not independently reach a decision of the child's best interests until a determination had been made as to the propriety of waiving the requirement of the guardian's consent. *See Adoption of Brown* (1958), 5 Wis. 2d 428, 92 N. W. 2d 749.

In 1959 the legislature changed the statute [3] and the recommendation of the guardian was given only pre-

[3] The State Board of County Judges submitted SB 143 to amend sec. 48.85, Stats., to dispense completely with the requirement of a guardian's consent to a proposed adoption. As proposed, SB 143 did not accord any particular significance to the guardian's recommendation on a proposed adoption although it was clearly contemplated a recommendation would be solicited. SB 143 did

sumptive effect but the presumption could be overcome by a clear preponderance of the evidence to the contrary. The section also provided for a hearing whenever the guardian opposed the adoption. In 1969 the section was again amended and the burden of proof required to overcome the presumption was changed from the clear preponderance of the evidence to fair preponderance of the credible evidence. Consequently, from the history of the section it appears there has been a progressive retraction of authority from the guardian in adoption proceedings and under the present law a trial court may determine the best interests of the child as an original proposition in an adoption proceeding; and where the adoption is not recommended by the guardian of the child, the presumption of the recommendation may be overcome by a fair preponderance of credible evidence. We think the trial court followed the proper procedure in its consideration of the petition.

The important question remains, did the court commit error, on the evidence presented, in concluding it was for the best interests of the child not to be adopted by his grandparents? To determine this, the evidence and the reasons given by the trial court must be reviewed.

### The best interests of the child.

The best interests rule was formulated by two eminent jurists, Justices CARDOZO and BREWER.[4] In *Chapsky v. Wood* (1881), 26 Kan. 650, Justice BREWER repudiated the rule which affirmed the parents' primary right and formulated the best interests of the child test. Later,

---

not pass, however, as originally proposed. Substitute Amendment No. 1, A to SB 143 was enacted. Laws of 1959, ch. 306, sec. 18. This measure offered a more comprehensive revision of the procedural statutes relating to adoption.

[4] Podell, Peck and First, *Custody—To Which Parent?*, 56 Marq. L. Rev. (1972), 51.

the then Judge CARDOZO affirmed this rule in *Finlay v. Finlay* (1925), 240 N. Y. 429, 148 N. E. 624. Although the term "the best interests of the child" is not defined, the Children's Code, ch. 48, Stats., in its initial section on general provisions states it is the intent of the code to promote the best interests of the children of this state through various means such as more adequate court procedure, programs for delinquents, protection of children, adequate care, and other matters. One of the items included in sec. 48.01 (2) (f) [5] to promote the best interests of a child is to assure he will be placed in the best home available, to protect him from adoption by persons unfit and to protect an adopted child from interference in adoptive homes by their natural parents. The code then lays down the command in sub. (3) "The best interests of the child shall always be of paramount consideration, but the court shall also consider the interest of the parents or guardian of the child and the interest of the public." [6]

---

[5] "48.01 Title, intent and construction of chapter. . . .

"(2) INTENT. It is declared to be the intent of this chapter to promote the best interests of the children of this state through: . . .

"(f) Assurance for children needing adoptive homes that they will be placed in the best home available; protection of children from adoption by persons unfit to have responsibility for raising a child; protection for children who are legally established in adoptive homes from interference by their natural parents."

[6] The Uniform Marriage and Divorce Act drafted by the National Conference of Commissioners on Uniform State Laws, with amendments approved August 27, 1971, lists the five factors most commonly relied upon to determine "best interests" for custody, as follows (p. 46) :

"Section 402. [*Best Interest of Child.*] The court shall determine custody in accordance with the best interest of the child. The court shall consider all relevant factors including:

"(1) The wishes of the child's parent or parents as to his custody;

"(2) the wishes of the child as to his custodian;

"(3) the interaction and interrelationship of the child with his parent or parents, his siblings, and any other person who may significantly affect the child's best interest;

The factors the trial court considered as controlling were that if the court were to grant the adoption the child could not be protected from interference by the natural parents, that the father would legally become his brother, and the grandparents were unsuitable because of their age, health, and the history of their own eight children. As a conclusion of law, the court stated "the best interests of the child will be promoted by denying the petition . . ." The trial court considered the determination of the best interests of the child to be a question of law, and we agree. Language to the contrary in *Adoption of Jackson* (1930), 201 Wis. 642, 231 N. W. 158, which states it to be a question of fact is withdrawn.

This is not a usual adoption case; nor does it involve the problem of custody faced in divorces where there are known alternative choices which can be appraised and setoff against each other. Here, the sole issue is whether grandparents can provide food, shelter, clothing, love and affection, education and training which will aid the child to develop to his full potential as a human being. All facts and circumstances relating to that goal are factors to be considered and weighed separately and in conjunction with other factors. The weight to be given to a factor differs from case to case because of its interrelation; a factor may be almost controlling in a given case and rather insignificant in another situation. The trial court and the respondent's witnesses treat this case as the usual case of adoption by a stranger and contrast the environment of the petitioners' home with the ideal home, which perhaps does not exist, and in which it is assumed this child now three and one-half years old can be easily

---

"(4) the child's adjustment to his home, school, and community; and

"(5) the mental and physical health of all individuals involved. The court shall not consider conduct of a proposed custodian that does not affect his relationship to the child."

placed for adoption in the future. We think it is significant that the petitioners are the grandparents of the child and have taken care of him since birth.

The evidentiary facts are not in dispute. Ed Shehow is a farmer residing in the rural area outside of Pound, Wisconsin; he owns a farm in Oconto county and his income from that farm is approximately $8,000 a year. Shehow lives with his wife, the house is paid for, and they have approximately $8,000 in savings; neither has life insurance. Mr. Shehow at the time of trial was fifty-nine years of age and Mrs. Shehow was fifty-three. Mr. Shehow has some history of suspected diabetes and Mrs. Shehow has indications of high blood pressure. The age and health of the adoptive parents are factors to be considered in the best interests of the child; but, like other factors, are not determinative and carry more or less weight depending upon their relationship to other facts. *Adoption of Shields, supra; Adoption of Brown, supra.* In *Brown* the court intimated there could be circumstances where a larger age difference than the normal age difference between the natural parents and their children should not bar a proposed adoption. Although many adoptive agencies have rules of thumb as to age for disqualifying prospective adoptive parents, they should not be conclusive.[7] When applied to strangers and at times when there are more people seeking to adopt children than there are children available for adoption, such rules may serve to determine a workable priority. Age difference in this case (approximately fifty and fifty-six years at the time of the birth of the grandchild) stressed by the court and the respondent has been considered in

[7] Personal qualities of the adoptive parents are of paramount importance; the age, income, and social class are far less important. Pringle, *Adoption Facts and Fallacies: A Review of Research in the United States, Canada and Great Britain Between 1948 and 1965* (Humanities Press, New York 1968).

cases from other jurisdictions as inconclusive and without other facts not controlling.[8] We find nothing in the health of the Shehows that is unusual or would indicate an unfitness on their part to be adoptive parents.

It is argued there was a possibility of the child not receiving proper education because the educational and disciplinary environment of the Shehow home in respect to their children did not show a desirable type of parental control. The trial court found Mr. and Mrs. Shehow had eight children, the eldest is thirty-five, the youngest fifteen. Only one of the seven older children graduated from high school and three withdrew from school at or before they were sixteen years of age. The youngest child was absent from school thirty-four days during 1971 and twenty-five days during 1972 and her grades were about average. The Shehow's youngest son LeRoy Edward, when he was a minor, had been committed to the boy's school at Wales as a delinquent. Certainly, the best interests of a child in this era requires at least a high school education or its equivalent. There was testimony the Shehows now appreciate the value of an education and the child would be given the opportunity and they would insist on the child going to school. All of the Shehows' children who had dropped out of school are

[8] *In re Adoption of Brown* (Fla. 1956), 85 So. 2d 617 (age without more should not be held to bar an adoption); *In re Duke* (Fla. 1957), 95 So. 2d 909 (forty-eight-year-old man, sixty-three-year-old woman, denial of petition on grounds of advanced age and financial position without more held an abuse of discretion); *In re Adoption of Christian* (Fla. App. 1966), 184 So. 2d 657 (advanced age alone not sufficient to bar adoption); *McGowen v. McGowen* (Tex. Civ. App. 1963), 364 S. W. 2d 477 (whether adoptive parents sixty-six and forty-nine years of age were too old within sound discretion of trial court); *In re Adoption of Child* (1971), 37 App. Div. 2d 78, 322 N. Y. Supp. 2d 532 (adoptive parents fifty-eight and forty-six, a child one and one-half years, held advanced age, although relevant and proper consideration, not decisive—child had lived with adoptive parents since birth).

either gainfully employed or married and the mother of children.

The trial court gave considerable weight to what it called the lack of assurance that the child could be protected from interference by the child's natural parents. The basis for this finding is that the mother of the child, subsequently married, lives approximately 10 miles' distance from the petitioners' residence. The boy's father is unmarried and lives in a small town, also about 10 miles distant. Because the natural parents know where their child is it is assumed they will interfere with its bringing up by its grandparents. Evidence to oppose this inference was adduced that the mother has visited the child about three times, has not picked up the child or touched it and that the father, when he comes to his parents' home, ignores the child.

In a normal adoption by strangers, it is generally considered the child should be placed in a home unknown to the natural parents so that the relationship of the adoptive parents to the child may become one of love, affection and loyalty based upon the acceptance by the child of the adoptive parents as his parents or who are sometimes called "psychological parents." To aid this concept, it was formerly thought the child should not be told he was adopted. But the more modern view is the child should be told at an early age that he is adopted and brought up with that idea so as to avoid any traumatic effect of a sudden realization he was adopted and deceived by those he learned to love as his parents. Every child has a right to know his origin. The noninterference by the natural parents does not necessarily depend upon their ignorance of the whereabouts of the child, although that is perhaps the most effective way to attain it. Nor does the possibility of interference necessarily increase with proximity. We think there will be less interference by natural parents with the discipline and upbringing of their child by grandparents than was

considered by the trial court. While noninterference is to be desired, it, like other factors, is not controlling.

We fail to see the court's concern that this adoption would cause the child difficulty because legally he would become his father's brother or that such relationship would have a traumatic effect upon the child. Any adoption by grandparents would legally make one of the parents a brother or sister of the child. We think too much weight was given to this factor and that it would have a continuing traumatic effect upon the child.

It is argued the adoption would cause psychological damage to the child for other reasons: (1) The bastard stigma; (2) rejection by natural parents; and (3) adoptive parents' death trauma. Every child born of illegitimate parents runs the risk of being stigmatized by unthinking or malicious persons. Such stigma was greater at common law when the child of illegitimate parents was called a bastard, but enlightened people have ceased to visit the original sin of their parents on the unfortunate child and have forsaken the Billingsgate language. In this state such a child is referred to in the legal literature as an illegitimate child. Children of illegitimate parents are no longer stigmatized by the public for a fault which was not theirs. Outside of the fact the people in the area of Pound probably know the origin of the child, there is no greater risk of this potential stigma being applied to the child than if he were in another environment. Each child born of illegitimate parents and who is adopted must learn to adjust himself to the fact of his birth and his adoption; and having done this, there should be little or no traumatic effect because some uncouth person brings up the matter.

It is argued there is a traumatic effect because of the rejection by natural parents, but this is true in all cases where the parental rights have been terminated and where the parents have voluntarily given up the child.

The fact of rejection is no different where the grandparents adopt the child or a stranger but it would seem the adoption by the grandparents would be some amelioration.

It is also argued because of the age of the adoptive parents, they would presumably die while the child is still young and this would cause a trauma. Death always is a trauma to the people who loved and cared for the deceased. The effect of such trauma depends upon the physical and mental makeup of the person in his relationship to the deceased. Death is inevitable and we have no assurance that if the child were to be adopted by younger people that they would live to a ripe old age. What is of concern is the loss of the parental guiding hand at an early age.

The appellants stress the immediate emotional injury which the child would suffer if it was taken away from the grandparents. There is testimony the child has lived with the grandparents all its life; looks upon the grandparents as psychological parents and identifies them with his sense of security. The child has been progressing beyond average for its age under the care and love of the Shehows, and there was psychiatric testimony that the separation of the child from those it considered to be its parents could have a very serious effect on the child's development. To the contrary, a social worker without psychiatric experience testified she had placed 30 children older than this child for adoption and they had all made satisfactory adjustments.

At one time, the courts paid less attention to the psychological trauma attendant upon disturbing the continuity of a child's environment than the courts do today. Some courts today have gone to the extreme and have held this factor to be controlling in adoption. *In re Adoption of Child by P* (1971), 114 N. J. Super. 584, 277 Atl. 2d 566; *In re Haun* (Probate Ct. Cuyahoga

County, Ohio 1971), 277 N. E. 2d 258. It has been said by a noted psychiatrist that the stability of environment is far more crucial than its precise nature and content.[9]

The literature on the problem of separation trauma of a young child is vast and interesting.[10] It is stated the important thing is not the mother in a biological sense but the mother figure, for it is the mother figure with which the child becomes totally identified and it is the mother figure whoever that might be that the child constantly turns to for nourishment and other physical comforts, love and security. It is stated that separation during the early years of an infant's life from the mother

---

[9] Dr. Andrew S. Watson, M.D., Professor of Law and Psychiatry, University of Michigan, in *The Children of Armageddon: Problems of Custody Following Divorce*, 21 Syracuse L. Rev. (1969), 55. Dr. Watson's observation is reproduced and noted with approval in Child Welfare, Vol. L1, No. 6, June, 1972, the journal of the Child Welfare League of America. Monroe L. Inker, Vice Chairman, Adoption Committee, Family Law Section of the American Bar Association authored *Expanding the Rights of Children in Custody and Adoption Cases* which appears in Child Welfare, *supra*, and which concurs in Dr. Watson's findings. The same sentiment is found in 5 Family Law Quarterly (No. 4 1971). *See also:* McDermott, *Parental Divorce in Early Childhood*, 124 Am. J. Psychiatry (1968), 1424, 1432, and N. Littner, *Some Traumatic Effects of Separation and Placement* (1956).

[10] J. Bowlby, M.D., *The Nature of the Child's Tie to His Mother*, International Journal of Psychoanalysis (1964), 350. *See also:* R. D. Singer & Anne Singer, *Processes of Early Development*, *Psychological Development of Children* (1964), 70. *See: Adoptions For The Hard-to-Place; The Role of the Court and the Trend Against Matching*, 25 University of Miami L. Rev. (1971), 749; *The Adoption of Baby Lenore: Two Interpretations of a Child's Best Interests*, 11 Journal of Family Law (1971), 285; Comment, *Alternatives to "Parental Right" in Child Custody Disputes Involving Third Parties*, 73 Yale L. J. (1963), 151; Comment, *Adoption: Psychological Parenthood As the Controlling Factor in Determining the Best Interests of the Child*, 26 Rutgers Law Rev. (1973), 693. Stella Chess, M.D., *An Introduction to Child Psychiatry* (1968), 15, 155.

figure causes apprehension, depression, withdrawal, and rejection of environment, slow movement, and stupor, anorexia, and weight loss, insomnia, eczema, and respiratory infections, and continued separation may bring on further withdrawal, persistent autoerotic activity, frozen rigidity, catatonia and cachexia.[11] It is perhaps this separation trauma that causes an adoption agency to place children for adoption as soon as possible. However, many children are placed in foster homes prior to adoption and the degree and duration of the trauma of separation depends on many factors.

The appellants to prove the separation trauma relied on the testimony of Dr. Thomas Bluett, a child psychologist who worked in the pediatric division of the Beaumont Clinic in Green Bay and Dr. Richard Hildebrand, a clinical psychologist in private practice. Their testimony was to the effect it would be dangerous to the child's emotional health to uproot this child from his grandparents and in their opinion it would be to his best interests that he stay in that home. Respondents did not put in any medical or psychological testimony but relied on a social worker and her superior from the county department of social services. This department does not place children for adoption but only places them in foster homes temporarily prior to adoption. It was their opinion from their experience that the long-range effect of leaving the child with the grandparents outweighed any immediate trauma of separation. Their opinion was not based upon any psychological testing because their department did not use that device in making placements. The social worker in her testimony outlined the social problems the child would face if he were left with his grandparents and these were based primarily on what the court considered were controlling factors.

[11] Robert G. Patton, M.D., *Growth Failure in Maternal Deprivation* (1963).

We think the respondent's witnesses and the court gave too little weight to the separation trauma factor and to the fact the child in his younger years and in his teens would accept the grandparents as substituted parents much quicker and more naturally than he would strangers. Perhaps this is another way of saying blood is thicker than water. Then, too, the mother desired the grandparents to adopt the child and her rights were terminated involuntarily. The weightiest factor militating against the adoption is the age of the grandparents. We think this is offset by the fact they are grandparents who can give natural love and affection and are inclined by ties of blood and human nature to raise this child in his interests. Considering all the factors discussed, we conclude the adoption of this child by his grandparents is in his best interests and the court was in error in not so concluding.

*By the Court.*—Judgment is reversed, with directions to grant the petition for adoption.

CONNOR T. HANSEN, J., dissents.