**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**December 27, 2019**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2019AP1874**

**STATE OF WISCONSIN**

Cir. Ct. No. 2017TP73

**IN COURT OF APPEALS**
**DISTRICT I**

IN RE THE TERMINATION OF PARENTAL RIGHTS TO D.I.H., A PERSON UNDER THE AGE OF 18:

STATE OF WISCONSIN,

       PETITIONER-RESPONDENT,

  V.

D. I. H.,

       RESPONDENT-APPELLANT.

APPEAL from an order of the circuit court for Milwaukee County: CHRISTOPHER R. FOLEY, Judge. *Affirmed.*

¶1      DUGAN, J.[1] D.I.H. appeals the orders terminating the parental rights of her mother, V.T, and her father, S.D.H., to her.  D.I.H. argues that the trial court erroneously exercised its discretion when it concluded that termination of V.T. and S.D.H.'s parental rights was in D.I.H.'s best interests.[2]  This court disagrees and, therefore, affirm.

## BACKGROUND

¶2      V.T. and S.D.H. are the parents of three girls.  D.I.H., the eldest, was born in March 2005.  D.I.H.'s younger sisters, M.L.H. and T.H., were born in April 2009 and June 2011, respectively.[3]  In 2012, S.D.H. was convicted of felony murder-armed robbery and he is currently imprisoned on that charge.  He is scheduled to remain in custody until approximately 2029.

¶3      In May 2014, when D.I.H. was eight years old, she and her sisters were removed from V.T.'s care due to neglect.  V.T.'s home was filthy, and lacked electricity, heat, and food.  V.T. also had a history of leaving the children

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2017-18). All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

[2] We note that D.I.H. filed an initial brief in support of her appeal.  However, she did not file any reply brief to either the State or the guardian *ad litem's* brief.  While we could deem D.I.H.'s failure to respond to the arguments presented by the State and the guardian *ad litem* as concessions and resolve the appeal on that basis, *see United Co-op. v. Frontier FS Co-op.*, 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578 (stating that the failure to refute a proposition asserted in a response brief may be taken as a concession), we have decided to address D.I.H.'s appeal on its merits.

[3] V.T. appealed the three orders terminating her parental rights to each of her children (2019AP1869-NM, 2019AP1870-NM, 2019AP1871-NM).  We found that the appeals had no merit and dismissed them on November 14, 2019.

S.D.H.'s parental rights to the three girls were terminated as a part of these proceedings. S.D.H. has not appealed the termination of his parental rights.

alone, and once neglected to pick them up from daycare. The Bureau of Milwaukee Child Welfare (BMCW) began receiving similar referrals in 2012.

¶4 On July 29, 2014, Milwaukee County Circuit Court Judge Michael J. Dwyer found that the children were in need of protection or services (CHIPS) and based on that finding, on October 16, 2014, a Milwaukee County Circuit Court Commissioner entered a dispositional order setting conditions for return of the children and placing them outside the home. The conditions for return of D.I.H. and her sisters included requirements that V.T. and S.D.H. stop using alcohol and illegal drugs, participate in formal treatment and community drug and alcohol support programs, provide random urinalysis, manage their own mental health, and properly parent and protect their children.[4]

¶5 On June 1, 2016, the dispositional order was extended by the Honorable T. Christopher Dee. For approximately two months during June and July 2016, V.T had a trial reunification with the children. The trial reunification ended in July 2016, when authorities learned that V.T. was being evicted and there was a warrant for her arrest. After the failure of the trial reunification, all of V.T.'s visitation with the children was supervised.

¶6 The BMCW attempted to provide multiple services to V.T., including random urinalysis testing, drug and alcohol abuse treatment, psychological evaluation, therapy, parenting services, and visitation. While the girls were under the CHIPS order, they were placed with their maternal

---

[4] There were also special conditions for S.D.H. as an incarcerated person.

grandmother for a day or two. The grandmother indicated that it could not be a long term placement due to her own medical issues.

¶7 V.T. was not maintaining her sobriety, she was not consistent with random urine screens, and she was not consistently engaging in drug and alcohol abuse therapy, or mental health treatment. She also was not consistently involved with D.I.H's therapeutic care and was not involved in the children's medical and dental care. Visitation presented multiple problems. V.T. made improper comments to the children during the visits, such as telling them "not to let therapists pick things out of their heads", and talking negatively about the case managers and the foster home. V.T. also behaved improperly during visits from July 2016 through spring 2017, and D.I.H. punched V.T. several times during a December 2016 visit. When D.I.H. came home from a visit with V.T. crying, D.I.H. told her foster mother that V.T. told her that she "needed to go get fucked by a boy."

¶8 Because of the December incident, visitation was suspended from December 2016 through approximately April 2017. Beginning in July 2016 and continuing through the spring of 2018, V.T. also lacked stable housing, which she needed if she was to care for the children.

¶9 On May 4, 2017, a petition to terminate V.T. and S.D.H.'s parental rights to the three children was filed alleging the grounds of continuing CHIPS

and failure to assume parental responsibility as to each parent.[5]  In June 2017, V.T. was charged with a third criminal offense of operating while under the influence of an intoxicant.

¶10     At a hearing on June 21, 2017, both V.T. and S.D.H. requested a jury trial on the grounds phase of the termination of parental rights cases.[6]  D.I.H., who was represented by the guardian *ad litem*, advised the trial court that she was not contesting the petition; however, if there was a grounds phase trial, she requested a jury trial.

¶11     The trial on the grounds phase was rescheduled several times.  On May 7, 2018, S.D.H. entered a no-contest plea to the failure to assume parental responsibility ground.  The trial court engaged in a plea colloquy with S.D.H. and accepted S.D.H.'s no-contest plea.  D.I.H. does not contest the adequacy of that plea proceeding.

¶12     V.T.'s grounds trial commenced on May 7, 2018.  On the second day of trial, V.T. advised the trial court that she wanted to enter a no-contest plea to the continuing CHIPS ground.  The trial court engaged in a plea colloquy with V.T. and, after an offer of proof by the child welfare case manager, accepted V.T.'s no-contest plea to the continuing CHIPS ground, dismissed the failure to

---

[5] Wisconsin has a two-part statutory procedure for an involuntary TPR.  ***Steven V. v. Kelley H.***, 2004 WI 47, ¶24, 271 Wis. 2d 1, 678 N.W.2d 856.  In the grounds phase, the petitioner must prove by clear and convincing evidence that at least one of the twelve grounds enumerated in WIS. STAT. § 48.415 exists.  *See* WIS. STAT. § 48.31(1); ***Steven V.***, 271 Wis. 2d 1, ¶¶24-25.  In the dispositional phase, the court must decide if it is in the child's best interest that the parent's rights be permanently extinguished.  *See* WIS. STAT. § 48.426(2); ***Steven V.***, 271 Wis. 2d 1, ¶27.

[6] The Honorable Christopher R. Foley began presiding over the proceedings when the petition to terminate parental rights was filed.  We refer to Judge Foley as the trial court.

assume parental responsibility ground, and found that V.T. was an unfit parent. D.I.H. does not contest the adequacy of that proceeding. A dispositional hearing was scheduled for October 1, 2018.

¶13    Subsequently, the guardian *ad litem* asked the trial court to appoint adversary counsel to represent D.I.H.'s interests. Adversary counsel then asked the trial court for additional time to prepare for the dispositional hearing and filed a change in placement request, asking the trial court to allow D.I.H. to move to her grandmother's home from the foster home where she and her two younger siblings had resided for more than two years.[7]

¶14    The contested dispositional hearing took place on November 20, 2018, and continued on February 4, 2019.[8] On February 6, 2019, the trial court issued a written decision that did not resolve the disposition issue, but included the trial court's factual findings and analysis of the six factors. Instead, while recognizing that D.I.H. and her sisters needed alternative permanence because neither parent had the capacity to safely parent them, the trial court requested that SaintA[9] facilitate therapy sessions between the foster mother and the grandmother, with some involvement of D.I.H.

---

[7] The maternal grandmother is the only grandmother whom we discuss in this opinion.

[8] At that time V.T. had a fourth OWI criminal charge pending.

[9] SaintA is a Milwaukee nonprofit, nonsectarian human services agency involved in foster care, education, and mental health services for individuals and families. *See* https://sainta.org/about-us/ (last visited Dec. 17, 2019).

¶15   The dispositional hearing resumed on May 8, 2019.  On May 10, 2019, the trial court issued a written decision terminating V.T. and S.D.H.'s parental rights to D.I.H. and her sisters.  D.I.H. appeals.

¶16   We refer to additional facts in our discussion.

## DISCUSSION

¶17   D.I.H. argues that, based on the trial court's factual findings, the only reasonable conclusion is that the termination of V.T. and S.D.H.'s parental rights was not in the best interests of D.I.H.  Therefore, she argues that the trial court erroneously exercised its discretion when it terminated V.T. and S.D.H.'s parental rights to her.

¶18   We conclude that the trial court's decision demonstrates that it properly exercised its discretion in terminating the parental rights of V.T. and S.D.H. to D.I.H.

### I.    Applicable law and the standard of review

¶19   At the dispositional phase of a termination of parental rights proceeding, the trial court must determine whether it is in the child's best interests to terminate parental rights.  *See* WIS. STAT. § 48.426(2); *Steven V. v. Kelley H.*, 2004 WI 47, ¶27, 271 Wis. 2d 1, 678 N.W.2d 856.  At a minimum, six factors set forth in WIS. STAT. § 48.426(3) must be considered by the trial court in deciding what is in the child's best interests.  *See Steven V.*, 271 Wis. 2d 1, ¶27.

¶20   Ultimately, the decision whether or not to terminate parental rights is a matter within the trial court's discretion.  *State v. Margaret H.*, 2000 WI 42, ¶27, 234 Wis. 2d 606, 610 N.W.2d 475.  We will uphold the trial court's decision

to terminate parental rights "if there is a proper exercise of discretion." *See id.*, ¶32. A trial court "properly exercises its discretion when it examines the relevant facts, applies a proper standard of law, and using a demonstrated rational process reaches a conclusion that a reasonable judge could reach." *Dane Cty. DHS v. Mable K.*, 2013 WI 28, ¶39, 346 Wis. 2d 396, 828 N.W.2d 198. The trial court is "the ultimate and final arbiter of the credibility of witnesses," and we must accept the trial court's credibility determination. *See Kimberly Area Sch. Dist. v. Zdanovec*, 222 Wis. 2d 27, 50, 586 N.W.2d 41 (Ct. App. 1998). We will not set aside the court's underlying factual findings unless they are clearly erroneous. *See* WIS. STAT. § 805.17(2).

¶21 In the trial court's decision making process, "the best interests of the child is the paramount consideration[.]" *Margaret H.*, 234 Wis. 2d 606, ¶33. To establish this, the trial court should reference the factors set forth in WIS. STAT. § 48.426(3), and any other factors it relied upon in explaining, on the record, the basis for the disposition. *Sheboygan Cty. DHHS v. Julie A.B.*, 2002 WI 95, ¶30, 255 Wis. 2d 170, 648 N.W.2d 402. The factors set forth in § 48.426(3) include:

> (a) The likelihood of the child's adoption after termination.
>
> (b) The age and health of the child, both at the time of the disposition and, if applicable, at the time the child was removed from the home.
>
> (c) Whether the child has substantial relationships with the parent or other family members, and whether it would be harmful to the child to sever these relationships.
>
> (d) The wishes of the child.
>
> (e) The duration of the separation of the parent from the child.
>
> (f) Whether the child will be able to enter into a more stable and permanent family relationship as a result of the termination, taking into account the conditions of the

8

child's current placement, the likelihood of future placements and the results of prior placements.

**II.   The trial court properly exercised its discretion when it determined that termination of V.T.'s parental rights was in the best interests of D.I.H.**

¶22   D.I.H. does not challenge the trial court's factual findings and she does not dispute the fact that the trial court discussed the six required statutory factors.   Rather, D.I.H. argues that the weight that the trial court attached to these factors was erroneous because she disagrees with the trial court's decision to terminate the parental rights of V.T. and S.D.H. to her.

¶23   We note that although D.I.H.'s overall challenge is broadly worded, she only actually presents arguments with respect to two of the six factors that the trial court considered.   D.I.H. argues that severing the biological ties to the extended family will be harmful to her because there is not clear and convincing evidence that D.I.H. does not have a substantial relationship with her grandmother, that the trial court gave minimal consideration to D.I.H.'s wishes and those of her siblings, and the guardian *ad litem's* comment that one could not force D.I.H. to be adopted if she did not want to be.

¶24   We review, in sequence, the six statutory factors that the trial court was required to consider in deciding to terminate the parental rights of V.T. and S.D.H. to D.I.H.   The trial court's decision is a composite of the February and May 2019 decisions and we refer to both.

*Likelihood of adoption*

¶25   The trial court determined that D.I.H. and her sisters would be adopted by the foster mother with whom they had resided for nearly three years, if the parents' parental rights were terminated.   However, in the February 2019

decision, the trial court noted that the guardian *ad litem* recommended that the two younger sisters be adopted by the foster mother and D.I.H. be placed with her grandmother.[10] The trial court rejected that suggestion, noting that separating the siblings was contrary to the strong statutory presumption that siblings should be placed together and that, since the younger girls also wished to live with their grandmother, placing D.I.H. with her grandmother and the other two children with the foster mother could undermine the viability of the placement for two younger children. The trial court emphasized that finding in its May 2019 decision. The trial court also found that even the grandmother recognized that she could not provide appropriate daily care for D.I.H. Additionally, as for the grandmother being the girls' full time caregiver, the trial court found "certainly not for all of the children."

¶26 Notably, the trial court praised the foster mother stating that her "courage and commitment" to the children was "simply stunning", and that she had provided "extraordinary care to the children to their great benefit." Moreover, the trial court found that, due to the efforts of the foster mother, D.I.H. had made "tremendous strides" emotionally, behaviorally and educationally. The trial court also noted that keeping D.I.H. and her sisters together was consistent with the statutory presumption that siblings should be placed together. It also stated that

---

[10] D.I.H. cites two cases regarding the need for a guardian *ad litem's* consent to adoption. *See* **Shehow v. Plier**, 60 Wis. 2d 540, 544, 210 N.W.2d 865 (1973); **Westphal v. Wis. State Dep't Pub. Welfare**, 4 Wis. 2d 219, 224, 89 N.W.2d 827 (1958).

The State argues that both those cases involved adoption and relied upon the statutes regulating adoption, and that neither decision applies to this case, which involves the termination of parental rights and the statutes regulating that, not adoption. D.I.H. has not refuted the State's argument and, therefore, has conceded it. *See* **Charolais Breeding Ranches, Ltd. v. FPC Secs. Corp.**, 90 Wis. 2d 97, 109, 279 N.W.2d 493 (Ct. App. 1979) (stating that failure to refute an argument constitutes a concession).

"[a]doption for all [the girls] is the last best chance these children have of not replicating their birth parents' destructive pattern of living."

¶27 D.I.H. does not directly challenge the trial court's analysis of this factor.

### Ages and health of the child

¶28 D.I.H. apparently has no physical health issues. The trial court did find, however, that D.I.H. has "emotional scars and manifestations of the trauma" she experienced in the care of V.T. D.I.H. raises no issue regarding this factor.

### Substantial relationships with parents and other family members and harm from severance

¶29 D.I.H. points out that the trial court found that she has a valued relationship with her grandmother and that the trial court described a possible plan to allow grandparent visitation.[11]

---

[11] D.I.H. also argues that courts have stated that a consideration in termination of parental rights is the likelihood that the adoptive resource will allow contact with the biological parent, citing *State v. Margaret H.*, 2000 WI 42, ¶29, 234 Wis. 2d 606, 610 N.W.2d 475. She goes on to state that it should be equally true that the trial court should give weight to the fact that the adoptive resource might limit or allow zero contact with the biological family.

We note that D.I.H. does not mention the trial court's express finding that V.T.'s continuing efforts to subvert the children's relationship and placement with the foster mother are very harmful to the children's "present and future emotional welfare." She also ignores the trial court's finding that both parents' "conduct and relationship to the children has been a pervasively negative factor in their lives." While D.I.H. clearly loves her parents, the trial court did not find the parents to be a positive factor in her life.

We also conclude that D.I.H. misreads *Margaret H.* Instead, the Wisconsin supreme court rejected the proposition that a trial court "must at least consider" a foster parent's promise to continue contact between children and a birth family and clarified that the trial court "*may afford due weight to an adoptive parent's stated intent to continue visitation with family members, although we cannot mandate the relative weight to be placed on this factor.*" *See id.* (emphasis added).

(continued)

¶30 Indeed, the trial court recognized that it was important that the relationship between D.I.H. and her grandmother continue, and that D.I.H. stay intimately connected with her grandmother. However, in its May 9, 2019 decision, the trial court found that ordering grandparent visitation was not possible because of V.T.'s active efforts to subvert the children and the foster mother's relationship. The trial court explained,

> I had actively considered granting grandparental visitation rights to [the grandmother] to assure that relationship is continued and nurtured. However, I now reject that approach for two primary reasons. First, [the grandmother] and [the foster mother] have a collaborative working relationship dedicated to meeting the children's needs. Far more importantly, as [V.T.'s] courtroom behavior yesterday clearly indicated, she has and will continue to make active efforts to subvert this placement in the future and [the foster mother] needs to be legally authorized to take any and all necessary steps—including temporarily or permanently ending contact—to prevent ongoing birth family contact from being used as an instrument to that end.

(Footnotes omitted.) The trial court's decision reflects careful consideration and balancing of the unique dynamics created by V.T.'s difficult conduct. We conclude that D.I.H. has not demonstrated that the trial court erroneously exercised its discretion with respect to the weight it afforded this factor.

---

Moreover, D.I.H.'s position that it should be equally true that the trial court should give weight to the fact that the adoptive resource might limit or allow zero contact with the biological family is not supported by any legal authority and D.I.H. does not develop any argument. Therefore, we decline to further consider the argument. *See State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992).

### *The wishes of the child*

¶31 The trial court clearly considered the wishes of D.I.H., who was fourteen years old as of May 2019. In its February 2019 decision, the trial court acknowledged that D.I.H., who had been placed with her grandmother for approximately a year in 2015 and 2016, wanted to live with her grandmother. However, the trial court also recognized that the grandmother's arthritis related health concerns would substantially inhibit her ability to meet D.I.H.'s needs. The trial court noted that, when the grandmother briefly had the three children for a second placement, the grandmother acknowledged that she could not meet their needs. Additionally, although D.I.H. had testified that her grandfather could provide support, the trial court had "no confidence" that the grandmother could adequately care for D.I.H., alone, or with her siblings. We further note that, at the May 8, 2019 dispositional hearing, the therapist who met with the foster mother, grandmother, and D.I.H., testified that D.I.H. told her that she wanted to live with her grandmother, if she could not live with her grandmother, she would stay with the foster mother. The foster mother had also provided similar testimony indicating that D.I.H. had always stated that, if she could not stay with her grandmother, she wanted to stay with her foster mother.

¶32 The trial court recognized D.I.H.'s strong relationship with her grandmother and her desire to live with her, and explained the reasons why that desire was not in D.I.H.'s best interest. We conclude that D.I.H. has not shown that the trial court's exercise of its discretion with respect to this factor was erroneous.

*Duration of the separation from the parents*

¶33 The trial court found that D.I.H. had been out of the parental home for approximately five years and had been continuously in the foster home for nearly three years. The trial court found that neither parent presently or in the foreseeable future had the capacity to parent D.I.H. or her siblings. The trial court found that the father was imprisoned until nearly the end of the next decade,[12] and that the mother was likely to be imprisoned in the near future for her fourth OWI. D.I.H. has not addressed this factor.

***The ability of the child to enter into a stable relationship if parental rights were terminated***

¶34 In its February 2019 decision, the trial court described the unstable living environment D.I.H. experienced living with her parents, especially V.T. It stated,

> [N]either parent has the capacity to safely parent the children. [S.D.H.] is imprisoned for felony murder and armed robbery until nearly the end of the [next] decade. [V.T.] has serious substance abuse issues and is highly likely to be imprisoned in the near future for her 4th OWI…. The children have been removed from her care twice. Once when the children were repeatedly left alone in dangerous and uninhabitable living circumstances; then after she left the children with their grandfather and disappeared for several days—a pattern of behavior repeatedly complained about by family members and other caregivers. Now, as noted, she has a fourth offense drunk driving pending. The behavior of the children is suggestive of at least significant exposure to sexual behavior, if not victimization. One need not be Solomon to recognize neither parent has the capacity to safely parent.

---

[12] The trial court omitted the word "next", an apparent typographical error given the testimony that S.D.H. was going to be in custody until 2029.

14

In its May 2019 decision, the trial court stated that "[a]doption for all is the last best chance these children have of not replicating their birth parents' destructive pattern of living."

¶35 As noted above, V.T. was not maintaining her sobriety, she was not consistent with random urine screens, and she was not consistently engaging in drug and alcohol abuse therapy or mental health treatment. She also was not consistently involved with D.I.H.'s therapeutic care and was not involved in the children's medical and dental care. Visitation presented multiple problems including the improper behavior of V.T. during visits from July 2016 through spring 2017 and D.I.H. punching V.T. several times during a December 2016 visit. Because of the December incident, visitation was suspended from December 2016 through approximately April 2017. Beginning in July 2016 and continuing through the spring of 2018, V.T. lacked stable housing, which she needed if she was to care for the children.

¶36 Addressing whether D.I.H. will be able to enter a more stable and permanent family relationship as a result of the termination, the trial court found that, if D.I.H.'s parents' parental rights were terminated, she would be able to enter into a stable relationship with the foster mother and maintain her relationship with her sisters. The trial court found that, given what D.I.H. and her sisters had experienced, it was self evident that their relationship to each other is the primary relationship in their lives. The trial court further found that placing D.I.H. in a different home from that of her sisters would end their very important daily practical relationship and their legal relationship to the "substantial detriment of all of the children." The trial court determined that keeping D.I.H. and her sisters in the same foster family would preserve their relationships with each other.

¶37    Trial court also strongly praised the foster mother, stating that her courage and commitment to D.I.H. and her sisters was "simply stunning." It also observed that the foster mother did not retreat from, and continued to confront "head on", for the benefit of the children, the challenges presented by the emotional scars and manifestations of the trauma that they experienced, while in the care of V.T.

¶38    Specifically addressing D.I.H., the trial court stated,

> She is a bright, resilient, determined young woman who has bravely advocated for herself…. She is at a fork in the road in her life. If she succumbs to her mother's active efforts to negatively influence her behavior and subvert her placement with/relationship to [the foster mother], there is a high probability she—and her sisters as well—will "replicate their parents' destructive pattern of living." If she ignores those negative influences—overcoming the admittedly very difficult emotional hurdle in recognizing nothing her mother is presently doing is what is best for her; embraces the commitment [the foster mother] has demonstrated; and seizes her potential, her future is very bright.

¶39    We conclude that the trial court found that D.I.H. would be able to enter into a more stable and permanent family relationship as a result of the termination of V.T. and S.D.H.'s parental rights. D.I.H. does not challenge this factor found by the trial court and we conclude that the trial court properly exercised its discretion with respect to this factor.

## CONCLUSION

¶40    In sum, we conclude that the trial court reasonably exercised its discretion in determining that the termination of the parental rights of V.T. and S.D.H. was in the best interests of D.I.H., *see Margaret H.*, 234 Wis. 2d 606, ¶¶32-33. Therefore, we affirm the trial court's order.

16

*By the Court.*—Order affirmed.

This opinion will not be published. WIS. STAT. RULE 809.23(1)(b)(4).